UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| RANDOLPH T. SCOTT,<br><br>    Plaintiff,<br><br>  vs.<br><br>UNUM LIFE INSURANCE COMPANY OF AMERICA,<br><br>    Defendant. | Case No: C 09-1841 SBA<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Dkt. 42 |

Plaintiff brings this breach of contract and insurance bad faith action against Defendant, alleging that Plaintiff was wrongfully denied benefits under disability income policies issued by Defendant. The parties are presently before the Court on Defendant's Motion for Partial Summary Judgment, whereby Defendant moves for summary judgment on Plaintiff's claim for punitive damages. Dkt. 42. Having read and considered the papers filed in connection with this matter and being fully informed, the Court hereby GRANTS the motion for the reasons set forth below. The Court, in its discretion, finds this matter suitable for resolution without oral argument. See Fed.R.Civ.P. 78(b).

**I.   FACTUAL BACKGROUND**

   **A.   THE DISABILITY POLICIES**

      **1.   Policy No. LAN660597**

In 1982, Union Mutual issued Plaintiff an "own occupation" disability income policy, Policy No. LAN660597. Dkt. 46, Eichel Decl. ¶ 4; Ex. A. Defendant assumed Plaintiff's disability income coverage in November 1986. Id. The policy provides a maximum monthly benefit for total disability until age sixty-five, with a sixty-day elimination period, plus a Residual Disability Benefit Rider, which provides a benefit for residual disability that follows a period of total disability. Id.

The policy defines total disability in the insured's own occupation as follows: "'Total disability' and 'totally disabled' mean that, as a result of sickness or injury, you are unable to perform the material and substantial duties of your occupation." Id., Ex. A at 5.  The policy defines "your occupation" as:

> (1) your regular occupation at the time disability begins – during the first 120 months of any continuous disability (or to the policy anniversary when you are age 55 if that is later);
>
> (2) thereafter – any gainful occupation for which you are reasonably fitted based on your training, education, experience and/or prior average earning.  Id.

The Residual Disability Rider provides:

> (1) "Residual disability" means that, as a result of the sickness or accident which caused total disability:
>
>    (a) you are unable to perform one or more but not all of the material and substantial duties of your occupation; or
>
>    (b) you can not (sic) perform the material and substantial duties of your occupation for as much time as they usually require.  Id. at 9.

### 2.     Policy No. LAD015365

A second disability income policy was issued by Defendant to Plaintiff in 1987, under Policy No. LAD015365.  Id. ¶ 4; Ex. B.  The policy provides benefits until age sixty-five, and includes the following definitions:

> "Impairment," "impairs" and "impaired" mean: (1) injury or sickness totally or residually disables the Insured; and (2) the Insured is receiving medical care from someone other than himself which is appropriate for the injury or sickness. … "Total disability" and "totally disabled" mean injury or sickness restricts the Insured's ability to perform the material and substantial duties of his regular occupation to an extent that prevents him from engaging in his regular occupation.  Id., Ex. B at 4.

Moreover, the policy defines "regular occupation" as "the Insured's occupation at the time the Elimination Period begins.  If the Insured engages primarily in a professionally recognized specialty at that time, his occupation is that specialty."  Id.  Also under this policy, an insured is "residually disabled" when the "injury or sickness does not prevent the Insured from engaging in his regular occupation, BUT does restrict his ability to perform the material

and substantial duties of his regular occupation: (i) for as long a time as he customarily performed them before the injury or sickness; or (ii) as effectively as he customarily performed them before the injury or sickness." Id.  Policy Nos. LAN660597 and LAD015365 are referred to collectively herein as "the Policies."

### B. PLAINTIFF'S CLAIM OF DISABILITY

In early January 2002, Plaintiff submitted a claim for disability benefits to Defendant. Id. ¶ 30.  In his claim, Plaintiff represented that he was disabled from his own occupation since October 2001 because of depression.  Id.  Plaintiff reported his occupation as President/CEO of Search & Consulting Partners, Inc., an executive search firm, and indicated that he spent fifty to sixty hours per week performing his occupational duties.  Id., ¶ 30; Ex. C.

### C. DEFENDANT'S INVESTIGATION

#### 1. Initial Payments Under the Policies

On February 4, 2002, Defendant conducted a telephone interview with Plaintiff, during which he stated that he started experiencing symptoms related to depression twelve years prior to the date of his claim.  Id., Ex. C at 0238-241.  Also during the interview, Plaintiff mentioned "job burnout" when discussing the nature of his disability, and stated he "goes through periods of burnout about once a year," with this period of burnout being worse.  Id. at 0240.  Plaintiff stated that he expected to return to his occupation, full time, by April 2002.  Id. at 0239. Defendant offered to pay Plaintiff benefits until June 15, 2002.  Id. at 0247.  Upon discussing Defendant's offer with his treating physician, Dr. Michael Levin, Plaintiff agreed to an advance payment of $31,341.80, which represented benefits from December 12, 2001 through June 15, 2002.  Id. at 0247.  Defendant advised Plaintiff that, in the event he had not returned to work by June 2002, he could submit a Claimant Statement and Attending Physician Statement ("APS"). Id. at 0247-248.  On February 11, 2002, Defendant informed Plaintiff that his claim was closed.  Id. at 0248.

#### 2. Reopening of Plaintiff's Claim

In June 2002, Plaintiff submitted a Claimant Statement that listed the same symptoms as previously reported.  Id. at 0255.  At that time, Plaintiff provided no expected return to work

date, but stated he "continued to stay open to jobs [he] might be able to perform." Id. Defendant then obtained medical records from Dr. Levin, requested documents from Plaintiff, and conducted field interviews of Plaintiff. Id. at 0273-275, 0286-292, 0326-330.

Upon receiving Plaintiff's medical records and the field interview reports, Larry Iannetti, Defendant's clinical consultant, reviewed Plaintiff's medical file and concluded that there was no documentation consistent with either significant distress or impairment in functioning. Id. at 0451-453. However, he reported that he would wait until he had an opportunity to speak with Dr. Levin before rendering a definitive decision. Id. at 0452. After speaking with Dr. Levin, and learning that Plaintiff had become more symptomatic, Mr. Iannetti concluded that the medical information was consistent with significant distress and functional impairments that would preclude Plaintiff from performing the duties of his occupation at that time. Id. at 0470. He also suggested that a vocational rehabilitation contact "may be appropriate to explore [Plaintiff's] potential interest in such services when clinically stable." Id.

Plaintiff's claim was thus reopened, and Defendant paid him benefits through September 2002. Id. ¶ 29.

### 3. Release to Return to Work

After reopening Plaintiff's claim, Defendant continued its investigation by evaluating Plaintiff's Claim Statements and APS forms, which indicated a potential return to work by April 2003, and requesting updated medical records from Dr. Levin. Id. ¶ 30; Ex. C at 0486, 0490, 0494-495. In January 2003, Defendant received from Plaintiff a Claimant Statement and APS form, which stated a potential April 2003 return to work date. Id., Ex. C at 0566, 0570. Mr. Iannetti spoke with Dr. Levin, who opined that Plaintiff's occupation remained a "good option" for him in the future, but it was premature to consider April 2003 as a return to work date. Id. at 0580. Mr. Iannetti told Dr. Levin that he would check in with him in March 2003 to further assess Plaintiff's readiness to return to work, and the two discussed the possibility of vocational rehabilitation for Plaintiff for another occupation. Id.

By March 2003, Defendant learned from Plaintiff that he had suffered a back injury and, given that development, Defendant delayed contacting Dr. Levin. Id. at 0611. By May 2003, Plaintiff's Statement of Claim and APS form indicated that his back problem had resolved. Id. at 0700, 0703.

In June and July 2003, Dr. Levin submitted APS forms that indicated he had released Plaintiff to return to work in "his occupation" and "any occupation." Id. at 0726, 0751, 0828. Upon receipt of the APS forms, Defendant contacted Plaintiff to further discuss his return to work. Id. at 0770-771. Defendant admitted that he had been working for at least six months, but he had not earned any income. Id. at 0772-773. Subsequently, Dr. Levin provided an APS form dated July 31, 2003, again releasing Plaintiff to work in his occupation or any occupation. Id. at 0828. Plaintiff informed Defendant in a later telephone discussion that he was spending thirty hours per week contacting clients in an effort to reestablish contacts, but he was unable to generate any income. Id. at 0808-809.

Based on this information, on September 2, 2003, Defendant paid Plaintiff $28,430.27, which represented benefits from August 15, 2003 through January 31, 2004. Id. at 0816-817.

### 4. Vocational Rehabilitation

In February 2003, while Defendant was investigating Plaintiff's claim, Defendant contacted Plaintiff to discuss the option of vocational services and the possibility of conducting a transferable skills analysis. Id. at 0586. During an initial call with Defendant's vocational rehabilitation consultant, Plaintiff stated that he was agreeable to "whatever will help," and indicated that he had no objection to Defendant contacting Dr. Levin for his input regarding vocational assistance. Id.

In 2004, Defendant conducted a field visit to discuss Plaintiff's vocational plans and performed a transferable skills analysis. Id. at 1414. The vocational analyst observed in her notes: "[Plaintiff] stated that he feels that with 2 to 3 months of intensive psychotherapy, he'd have more concentration and more focus in being able to actually embark on a job search. … I did point out to him that it appeared, based on his report of feeling he needs 'intense psychotherapy,' he may wish to do this prior to embarking on a job search/career exploration.

I also pointed out that if we provide services, they need to be mutually beneficial and further testing may not be mutually beneficial if it does not result in his return to work." Id. Thus, Defendant communicated to Plaintiff on September 7, 2004 that it would not be providing further vocational services "at this time." Id.

### 5. Independent Medical Examinations

While receiving disability benefits through January 2004, Plaintiff submitted additional information to Defendant, including updated notes from Dr. Levin. Upon receipt of this information, Defendant informed Plaintiff that it would continue to pay Plaintiff benefits under a reservation of rights, while conducting independent medical evaluations ("IMEs") to assess his condition. Id. at 0963. In February 2004, Defendant requested independent medical evaluations of Plaintiff by Mark Kimmel, Ph.D. and Charles Seaman, M.D. Id. at 1017.

In March 2004, Dr. Kimmel issued a twenty-page psychological IME report. Id. at 1058-1077. Dr. Kimmel reported that the results of Plaintiff's psychological testing "suggest exaggeration," and stated that, while Plaintiff's history indicated a "longstanding personality dysfunction," "pathology does not always translate into disability." Id. at 1076. Dr. Kimmel also concluded that Plaintiff had not had adequate psychotherapy and suggested that his medications be adjusted. Id.

In April 2003, Dr. Seaman generated a forty-seven page psychiatric IME report in which he opined that Plaintiff suffered from an Adjustment Disorder, but did not have Major Depressive Disorder. Id. at 1112-1158. Dr. Seaman concluded that Plaintiff's "lack of employment pursuits is not the result of any specific psychiatric symptoms or impairments," but rather was due to Plaintiff's opinion that "he cannot work in a job that is below a professional or management level." Id. at 1157. Dr. Seaman suggested a treatment plan focused on psychotherapy, and found that Plaintiff's impairments and symptoms were "situational in nature," and would "likely improve immediately if he was given the financial support necessary to get his business started." Id at 1158. Dr. Seaman also opined that "he could probably start working or training immediately …. However, if his work involves restarting a business in the executive search or consulting industry, he would be highly

vulnerable to losing his motivation …." Id. Finally, Dr. Seaman opined that Plaintiff "should consider other occupational opportunities besides the executive search and consulting business because he has recurrent problems with thinking of himself as 'fake' or 'phoney' in that environment." Id.

The IME reports of Drs. Kimmel and Seaman were reviewed in 2004 by Drs. John Szlyk and Alex Ursprung, Defendant's medical consultants specializing in psychology and psychiatry, and they agreed with the conclusions drawn in the IME reports. Id. at 1170-1175, 1178-1180. The IME reports were also provided to Dr. Levin, who did not comment on or challenge the conclusions drawn in the reports. Id. ¶¶ 28-29. Defendant continued to pay monthly disability benefits to Plaintiff while it considered the IME reports. Id. ¶ 29.

### 6. Defendant's Reevaluation of Plaintiff's Condition After Two Years

Following the IME reports, Plaintiff continued to submit Claimant Statements and APS forms, indicating minimal changes in his clinical treatment or his claimed symptoms. Id., Ex. C. at 1665, 1669, 1680, 1690, 1699. In November 2006, Defendant requested that additional examinations be conducted by Drs. Kimmel and Seaman. Id. at 2070.

Dr. Kimmel conducted Plaintiff's evaluation on December 1, 2006. Id. at 2163-2176. In his fourteen-page report, Dr. Kimmel opined that "there are elements of secondary gain operating here. [Plaintiff] is clearly capable of working from a cognitive perspective." Id. at 2174. Dr. Kimmel further opined that "there are also elements of malingering, as [Plaintiff] appears to be overstating the nature and extent of his problems." Id. Dr. Kimmel's report was sent to Dr. Levin on December 12, 2006. Id. at 2179.

In January 2007, Dr. Seaman produced a thirty-page report that concluded that Plaintiff was not depressed at the time of the evaluation. Id. at 2211-2240. Dr. Seaman also opined that Plaintiff did not have an Axis I psychiatric condition or diagnosis because he was generally functioning well in all areas of life except for employment. Id. Dr. Seaman diagnosed Plaintiff as having an "'Occupation Problem,' namely, [Plaintiff] does not have an occupation that he feels suitable with." Id. at 2231. Dr. Seaman noted that Plaintiff "reported that he is now waiting for the right opportunity to come along, one that [he] will feel is appropriate." Id.

Defendant's internal medical consultants reviewed and agreed with the additional IME reports. Id. at 2265-2270, 2273-2276. During this time, Plaintiff continued to receive monthly disability benefits as Defendant continued to investigate his claim. Id. ¶ 29. Then, in March 2007, Defendant sent Plaintiff a letter indicating that it was denying Plaintiff's claim for disability benefits, as of March 28, 2007, because he had not shown that he was totally disabled under the terms of the Policies. Id., Ex. C. at 2438-2443.

### D. PLAINTIFF'S APPEAL

On May 1, 2007, Dr. Levin sent Defendant a letter expressing his disagreement with the denial of Plaintiff's claim. Id. at 2568-2569. He opined that the claim denial was furthering Plaintiff's disability and interfering with his ability to work. Id. Defendant considered this letter during its review of the claim file during the processing of Plaintiff's appeal (which Plaintiff initiated on a date not specified in the record). Id. at 2637-2639.

In a subsequent letter, dated June 28, 2007, Dr. Levin detailed the adverse impact that the claim denial was having on Plaintiff's condition. Id. at 2912-2913. Upon receipt of that letter, Defendant requested that Dr. Levin provide a complete set of Plaintiff's medical records. Id. at 2925. Defendant received and reviewed the updated medical records provided by Dr. Levin during the appeal process, and contacted Dr. Levin to discuss his opinions as to Plaintiff's condition. Id. at 2974-2976.

Defendant reopened Plaintiff's claim at the end of 2007, and advised him that additional independent medical examinations would be conducted to clarify the difference in opinions between Dr. Levin and Drs. Kimmel and Seaman. Id. at 2868-2869. Defendant also informed Plaintiff that his benefits "would be updated" and paid under a reservation of rights. Id. at 2876.

### E. DEFENDANT'S SUBSEQUENT INVESTIGATION AND DENIAL

After reopening Plaintiff's claim, Defendant arranged for IMEs with two new doctors that had no prior involvement with his claim – Eric Morganthaler, Ph.D. and Dr. Kenneth Gottlieb. Id. ¶¶ 18-19. Defendant also conducted multiple days of surveillance of Plaintiff. Dkt. 43, Parsons Decl. ¶ 7.

In March 2008, Dr. Morganthaler completed his psychological testing of Plaintiff. Eichel Decl., Ex. C at 3768-3780. In his report, Dr. Morganthaler opined that Plaintiff's test results indicated that he was "grossly exaggerating" the extent of his emotional difficulties, to the point that Plaintiff presented himself as a "severely psychotic, paranoid, depressed, anxious, and physically ill individual" who was suffering from "auditory and visual hallucinations, persecutory beliefs, depersonalization, and bizarre experiences." Id. at 3778. Also in March 2008, Defendant received Dr. Gottlieb's report, in which he concluded that Plaintiff's cognitive functioning was unimpaired, he had normal attention and concentration, and there was no suggestion of depression, dysphoria, or anxiety. Id. at 3800-3831.

Defendant also obtained Social Security information from Plaintiff, as he had been approved for Social Security benefits in June 2004, based on a diagnosis of affective mood disorder. Id. at 2215. However, that information did not include any medical information past 2004. Id. ¶ 18.

On April 11, 2008, Defendant sent Plaintiff a denial letter explaining its claim determination and enclosing a final benefits check. Id. ¶¶ 24, 26. Plaintiff expressed his dissatisfaction with the denial, and the claim was subsequently reviewed by Defendant's appeal unit, which upheld the denial. Id. ¶ 27; Dkt. 44, Carlson Decl. ¶¶ 5-12.

## II.   PROCEDURAL BACKGROUND

Plaintiff filed this action in the Superior Court of California, County of Contra Costa, on March 27, 2009. In his complaint, Plaintiff brings the following causes of action against Defendant: (1) breach of contract; and (2) and breach of the implied covenant of good faith and fair dealing. In his breach of implied covenant claim, Plaintiff asserts that Defendant breached the covenant by unreasonably failing to pay benefits, delaying the payment of benefits, misrepresenting pertinent facts, failing to reasonably and promptly investigate and process Plaintiff's claim, and failing to provide a reasonable explanation of the basis for its denial. Dkt. 1, Compl. at 6-7. Plaintiff also seeks, in his breach of implied covenant claim, punitive damages based on Defendant's alleged breaches. Id. at 8.

Defendant removed this matter on diversity grounds on April 28, 2009.  Now, Defendant has moved for partial summary judgment on Plaintiff's claim for punitive damages.  Defendant has not moved for summary judgment as to Plaintiff's breach of contract or breach of implied covenant claims.

### III.    LEGAL STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  The moving party bears the initial burden of demonstrating the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file that establish the absence of a triable issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the moving party meets this initial burden, the burden then shifts to the non-moving party to present specific facts showing that there is a genuine issue for trial.  Fed.R.Civ.P. 56(e); Celotex, 477 U.S. at 324; Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

"On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts.'"  Ricci v. DeStefano, -- U.S. --, 129 S.Ct. 2658, 2677 (2009) (quoting Scott v. Harris, 550 U.S. 372, 380 (2007)).  An issue of fact is "material" if, under the substantive law of the case, resolution of the factual dispute might affect the outcome of the claim.  See Anderson, 477 U.S. at 248.  Factual disputes are genuine if they "properly can be resolved in favor of either party."  Id. at 250.  Accordingly, a genuine issue for trial exists if the non-movant presents evidence from which a reasonable jury, viewing the evidence in the light most favorable to that party, could resolve the material issue in his or her favor.  Id.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Id. at 249-50 (internal citations omitted).

## IV.   ANALYSIS

Under California law, punitive damages are available to a plaintiff who proves by clear and convincing evidence that the defendant is guilty of oppression, fraud, or malice. Cal. Civ. Code § 3294(a). Summary judgment on a claim for punitive damages is proper "when no reasonable jury could find the plaintiff's evidence to be clear and convincing proof of malice, fraud or oppression." See Hoch v. Allied-Signal, Inc., 24 Cal.App.4th 48, 60-61 (1994). "In a bad faith action, evidence that the insurer has violated its duty of good faith and fair dealing does not alone necessarily establish that it has acted with the requisite intent to justify an award of punitive damages. … [e]ven if an insurer has acted unreasonably, it need not follow that it also acted with malice." Patrick v. Maryland Casualty Co., 217 Cal.App.3d 1566, 1575-76 (internal citations omitted) (upholding grant of summary judgment on plaintiff's punitive damages claim even though defendant's claims handling practices "were shoddy" and "at times witless and infected with symptoms of bureaucratic inertia and inefficiency," finding that "we cannot find liability here for punitive damages based merely upon the insurer's inept and negligent handling of a claim").[1]

In support of its motion, Defendant argues that the evidence presented demonstrates that Plaintiff's punitive damages claim is without merit. As noted by Defendant, the evidence shows that, in reaching its claim determination, Defendant considered, over a six year period: six independent medical evaluations by four doctors; several Claimant Statements and Attending Physician Statements; two field interviews; and numerous internal clinical consultant reviews. Eichel Decl. ¶ 29. Moreover, Defendant engaged in correspondence with Plaintiff and his treating physician, Dr. Levin, throughout the claim process. Also, Defendant paid Plaintiff benefits totaling $388,604.07 from December 2001 to March 2008, while it reviewed Plaintiff's claim. Id.

---

[1] As indicated, Defendant has not moved for summary judgment on Plaintiff's breach of contract or breach of implied covenant claims. As such, the analysis and findings herein are limited to the issue of whether summary judgment should be granted as to Plaintiff's punitive damages claim.

In his opposition, Plaintiff argues that the following facts demonstrate "triable issues of material fact for a reasonable jury to find that [Defendant's] conduct warrants punitive damages": (1) Defendant should not have relied upon its independent medical examiners because they did not understand Plaintiff's occupational duties; (2) Plaintiff "was constantly being forced to defend himself" to Defendant; (3) Plaintiff asked Defendant for rehabilitation benefits, and that request was denied; (4) Defendant disregarded the significance of Plaintiff's Social Security benefits; (5) Defendant disregarded Dr. Levin's opinions; and (6) Defendant failed to consider whether Plaintiff was disabled from his "own occupation," as that term is defined by the Policies.

As explained below, even viewing the evidence in Plaintiff's favor, he has failed to establish that a reasonable jury could find clear and convincing evidence that Defendant acted with oppression, fraud, or malice in handling Plaintiff's claim.

### A. THE IME REPORTS

Plaintiff argues that Defendant should not have relied upon its independent medical examiners because they did not understand Plaintiff's occupational duties. This argument is refuted by the IME reports, which indicate that the IME doctors reviewed documents in which Plaintiff described his occupational duties. See e.g., Eichel Decl., Ex. C at 1062, 3774, 3808. Also, Dr. Seaman testified that it was his understanding that Plaintiff was an executive recruiter for high-tech companies, which is the occupation stated on Plaintiff's claim forms. Dkt. 75-2, Jain Decl., Ex. C (Seaman Dep. Tr.) at 27:5-14. Dr. Kimmel's report indicates that, in addition to receiving occupational information from Plaintiff during the examination, he reviewed documents that contained occupational information, such as one of Defendant's field reports, to obtain an understanding of Plaintiff's occupational duties. Eichel Decl., Ex. C at 326-329, 1062. Also, Dr. Kimmel testified that he had an understanding of Plaintiff's occupational duties at the time he conducted his assessment. Jain Decl., Ex. B (Kimmel Dep. Tr.) at 108:21-24.

In view of these factors, no reasonable jury could find clear and convincing proof that Defendant acted with oppression, fraud, or malice in relying on the IME reports.

**B. PLAINTIFF'S ALLEGATION THAT HE WAS "FORCED TO DEFEND HIMSELF"**

Plaintiff asserts that he was "forced to constantly defend himself" to Defendant, and that this factor supports a claim of punitive damages. This argument is unpersuasive because, under the Policies, Plaintiff was required to provide proof of his disability. Eichel Decl., Exs. A and B. Furthermore, Plaintiff continued to provide Defendant with expected return to work dates that never materialized. Indeed, Plaintiff's initial return to work date was April 2002. The evidence does not support the conclusion that Defendant acted with oppression, fraud, or malice in continuing to assess Plaintiff's claim of disability and readiness to return to work. To the contrary, Defendant was responding to the vacillating nature and fluidity of Plaintiff's projections.

**C. PLAINTIFF'S REQUEST FOR VOCATIONAL ASSISTANCE**

Plaintiff asserts that, during the claim process, he "made multiple requests for assistance under the Rehabilitation Benefits of the Policies," which Defendant improperly rejected. Plf.'s Opp. at 11. The Rehabilitation Benefits provision in Policy LAN660597 provides: "while you are receiving the Total Disability Benefit, we will consider participating in a rehabilitation program. The program may be at your request or we may suggest it. …" Eichel Decl., Ex. A. at 0025. A similar policy provision is found in Policy LAD015365: "While the Insured is receiving Disability Benefit, you may request or we may suggest participation in a rehabilitation program designed to help him return to work … [i]f we determine that such a program is appropriate …." Id., Ex. B at 0011.

Of note, Plaintiff concedes that "it was in [Defendant's] sole discretion to offer benefits under these terms." Plf.'s Opp. at 11. Plaintiff has offered no suggestion that, in determining that this discretionary benefit was inappropriate, Defendant acted with oppression, fraud, or malice. Therefore, this argument fails to support Plaintiff's punitive damages claim.

**D. PLAINTIFF'S SOCIAL SECURITY BENEFITS**

Next, Plaintiff argues that Defendant disregarded the significance of Defendant's Social Security Benefit award in evaluating his claim. However, Plaintiff has not offered any evidence that Defendant acted with oppression, fraud, or malice in finding that Plaintiff's

- 13 -

1   receipt of Social Security benefits, when viewed in light of other factors, failed to establish
2   Plaintiff's disability.  As noted by Defendant, the Social Security information provided by
3   Plaintiff did not include any medical information past 2004, so as to inform his claim of an
4   ongoing disability.

### E.   DR. LEVIN'S OPINIONS

Plaintiff also argues that punitive damages are appropriate because Defendant "intentionally disregarded" Dr. Levin's opinions.  Yet, the evidence demonstrates that Defendant had multiple communications with Dr. Levin and involved him in the claim process. Defendant ultimately disagreed with Dr. Levin, in view of the reports of its independent medical examiners.  Plaintiff has offered no evidence sufficient to demonstrate that Defendant acted with oppression, fraud, or malice in rejecting Dr. Levin's opinions.  Nor has Plaintiff offered any authority for his proposition that an insurer necessarily acts with oppression, fraud, or malice by failing to follow the opinion of a treating physician.

### F.   PLAINTIFF'S OWN OCCUPATION

Finally, Plaintiff summarily asserts that Defendant failed to consider whether he "was unable to perform the material and substantial duties of an Executive Recruiter in the high technology industry with reasonable continuity."  Plf.'s Opp. at 20.  With this argument, Plaintiff simply restates his position that Defendant should have relied upon Dr. Levin, who opined that Plaintiff could not return to any occupation.  Again, the evidence does now show, in a clear and convincing fashion, that Defendant acted with oppression, fraud, or malice in disagreeing with Dr. Levin.  As indicated above, the evidence supports the conclusion that Defendant's independent medical examiners – which Defendant relied upon in making its

claim determination – had an understanding of Plaintiff's duties as an Executive Recruiter. As such, this argument also fails to support Plaintiff's punitive damages claim.[2]

## V. CONCLUSION

For the above stated reasons, Defendant's Motion for Partial Summary Judgment as to Plaintiff's punitive damages claim is GRANTED. This Order terminates Docket 42.

IT IS SO ORDERED.

Dated: December 2, 2010

                                             _Saundra B Armstrong_
                                             SAUNDRA BROWN ARMSTRONG
                                             United States District Judge

---

[2] As a final matter, Plaintiff argues that Defendant should not be granted summary judgment because Defendant "has a long history of unfairly denying claims." Plf.'s Opp. at 16. In support of that argument, Plaintiff submits with his opposition brief a Regulatory Settlement Agreement ("RSA") allegedly entered into by Defendant in 2004, in response to an examination by the California Department of Insurance regarding Defendant's (as well as forty-eight other insurance department's) claim handling policies. Dkt. 63, Ex. A. Defendant moves to strike this document under Federal Rule of Evidence 401 as being irrelevant. Defendant's motion to strike is GRANTED. Plaintiff has failed to explain how this document is relevant to the factual circumstances surrounding Defendant's handling of Plaintiff's claim, or to the question of whether Defendant's actions constitute oppression, fraud, or malice. Furthermore, Plaintiff has accompanied his opposition brief with a thirty-eight page declaration from Mary Fuller, a disability insurance specialist, who offers various opinions regarding Defendant's handling of Plaintiff's claim. Dkt. 63. However, nowhere in his brief does Plaintiff cite to, or predicate his arguments on, Ms. Fuller's declaration. Defendant has also moved to strike Ms. Fuller's declaration as being irrelevant. As Plaintiff has entirely failed to rely on Ms. Fuller's declaration in opposing Defendant's summary judgment motion, Defendant's motion to strike the Fuller declaration is GRANTED.